**Dunwoody Estate**

Before Klein, A. J., Bolger, Lefever, Saylor, Shoyer and Silverstein, JJ.

LEFEVER, J., November 9, 1970.—This matter comes before the court on petition and answers. Petitioner is Frank A. Bedford, 3rd (hereinafter designated "husband"). Respondents are: (a) Virginia K. Bedford, petitioner's wife at the time the petition was filed (hereinafter designated "wife"); (b) the Fidelity Bank and Richard F. Ennis, Trustees under Will of Edwin H. Dunwoody (hereinafter designated "trustees"); and (c) Judith J. Jamison, Esq., guardian ad litem for the Bedfords' three minor children and trustee ad litem for wife's unborn issue (hereinafter designated "the ad litem").

The court signed a preliminary decree, dated October 30, 1969, directing the issuance of a citation to respondents. The citation was issued and responsive answers were filed.

The question before the court is whether an option granted to husband and wife to purchase 256 Beech Hill Road, Wynnewood, Pa., can be exercised by

husband alone, upon his tender of the agreed price to trustees, the title holders of the real estate covered by the option, without the joinder of wife.

Husband and wife were married on August 14, 1948. The youthful couple had just been graduated from high school. Their plans and dreams contemplated (a) husband's entry into the College of the University of Pennsylvania and his subsequent admission to, and graduation from, law school, and (b) wife's attendance at college. Husband's sole income during college and law school was derived from part-time employment during the school year and full time employment during vacations. In contrast, wife was the beneficiary of the income from a substantial trust created by her great-grandfather; support allowance contributed to her by her grandfather, Edwin Dunwoody, during his lifetime, and after his death the income from the instant trust he created for her; and finally, upon her mother's death, considerable assets she inherited from her.

In due course, husband successfully completed college and law school and was admitted to the bar; wife finished one-half year at Harcum Junior College; and three children were born, namely, Frank A. Bedford, 4th, on June 5, 1949, Suzanne H. Bedford on September 15, 1952, and Robert B. Bedford on August 23, 1956.

Husband and wife lived harmoniously in various rented apartments and houses in Philadelphia and the suburbs until July 18, 1955, when they moved into their first "own home," located at 132 Fairview Road, Penn Valley, Lower Merion Township, Montgomery County, Pa. The land on which the house was situated and the materials for its construction were purchased by Edwin H. Dunwoody. Title was taken in Dunwoody's name. However, much of the house was built by the

manual labor of husband who had acquired the necessary skills by working for various construction companies after school hours and during school vacations, and carpentry was his major hobby. In this building project, husband received "assistance from time to time of wife." This house was not fully completed when they moved into it in 1955, and the unfinished work was done by husband and wife throughout the following year. The house was included as one of the assets of the corpus of the trust, created by wife's grandfather, in his will, which provided, inter alia, that:

"ITEM FIVE: I direct my Trustees to permit my granddaughter, MARY VIRGINIA BEDFORD, and her family to use and occupy premises 132 Fairview Road, Penn Valley, Lower Merion Township, Montgomery County, Pennsylvania, if I own said premises at the time of my death and so long as she, the said MARY VIRGINIA BEDFORD, may desire. Such use and occupancy is to be without charge and if the said MARY VIRGINIA BEDFORD desires that these premises, 132 Fairview Road, Penn Valley, Lower Merion Township, Montgomery County, Pennsylvania, be sold and the proceeds invested in a different home for herself and her family the full cooperation of my Trustees is requested."

Eventually, this house became too small (a) to accommodate the Bedfords' expanding family and (b) to provide space for husband's growing law practice, which required a law office, a waiting room and quarters for his secretary, all of which were squeezed into the Fairview Road Home. Both Bedfords desired to acquire a larger home which would provide appropriate facilities for their family and space for husband's law practice; in addition, it appeared that Federal income tax advantages would accompany such an arrangement. The property at 256 Beech Hill Road,

Wynnewood, admirably suited their needs. However, the Bedfords did not have the funds with which to purchase this larger and more valuable property. They, therefore, requested trustees to assist them in accomplishing their desires. Trustees agreed to do so.

On August 19, 1959, trustees and wife filed a petition with this court requesting leave to trustees to use trust assets to purchase the Beech Hill Road property. The petition averred, inter alia, "That pursuant to Item Five of said Will, petitioner, Mary Virginia Bedford, desires that premises 132 Fairview Road, Penn Valley, Narberth, Pennsylvania, be sold and the proceeds therefrom, together with such additional trust funds as are necessary, be invested in another home as hereinafter indicated for herself and her family," and "That the Trustees and the life tenant desire that the Beech Hill Road property be purchased as a trust investment employing funds from the sale proceeds of the 132 Fairview Road property and the remaining necessary funds from trust principal." The petition and attached affidavits were signed by trustees and wife.

In view of the fact that under testator's will wife's children had a remainder interest in the trust, the court appointed Judith J. Jamison, Esq., guardian ad litem for the minor children and trustee ad litem for any unborn issue of wife. The court deliberately appointed an able female lawyer as ad litem, and directed her to investigate the legal aspects of the case, view the plan through the eyes of a married woman and then file her report and recommendation. Mrs. Jamison made a complete investigation, including physical inspection of both homes and discussing the proposed plan with wife.

Thereafter, following protracted negotiations among trustees, trustees' counsel, the ad litem and the Bedfords and several conferences of counsel with

the court, trustees entered into tentative written agreements with the Bedfords, dated October 28, 1959, and October 30, 1959, which provided, inter alia, that:

a. Trustees would purchase the Beech Hill Road property, as a trust asset, for $52,500;

b. The net proceeds of the Fairview Road property, which would be sold at auction and which, when sold, amounted to $29,280.53, were to be applied to the purchase price of the Beech Hill Road property;

c. The difference between said net proceeds and $40,000, viz. $10,719.47, was to be paid by the Bedfords;

d. The remaining $12,500 plus the settlement costs, a total of $13,439.91, were to be advanced by trustees, to be repaid by the Bedfords in quarterly installments of $300;

e. Title was to remain in trustees, but the Bedfords were to be given the option of purchasing the Beech Hill Road property at any time within 10 years for $52,500, less whatever payments, specified in subparagraphs c and d above had been made by the Bedfords;

f. In the event of wife's death, prior to the exercise of the option, husband would pay interest at the rate of six percent per annum on the unpaid balance of the loan; and

g. The Bedfords were to forfeit all moneys advanced by them to trustees, if the option was not exercised within 10 years.

These agreements were made subject to the approval of the court. However, none of the agreements contained any provision covering the separation or divorce of husband and wife. This contingency was apparently not considered or even thought of by any of the parties or the court.

The ad litem filed an extensive, thoughtful, carefully prepared written report. In it she stated that husband and wife seemed to be a devoted married couple and

when she tactfully asked wife the specific question as to her relationship with husband, the latter answered that her marriage was a happy one. Moreover, the Bedford children seemed to be a loved part of an affectionate, closely-knit family. [Here, the court quoted at length from the ad litem's report which concluded that the agreement was fair and recommended that the court approve it.]

After careful consideration of the report of the ad litem and the above-mentioned agreements and further conferences with the ad litem and counsel for all parties, the court entered a decree dated October 29, 1959, which approved the plan set forth above and authorized trustees to use the necessary corpus of the trust to accomplish it.

Thereafter, the lease-purchase agreement was signed, the Fairview Road house was sold for a net price of $29,280.53, and the balance of $10,719.47 was paid by check in the amount of $7,000 drawn upon wife's account and the $3,719.47 balance was paid by husband and wife, although there is dispute as to who provided these funds. Subsequently, the regular quarterly payments of $300 were punctiliously made until the required $12,500 and settlement costs were paid, although, again, there is controversy as to whose funds were used to make these payments. The final date to exercise the option was October 30, 1969.

During the intervening years, marital differences arose between the Bedfords and on October 24, 1968, they separated, husband moving to an apartment at Oak Hill Apartments, Penn Valley, Narberth, Pa., and wife remaining in the home at Beech Hill Road with the three children.

On October 1, 1969, after wife had refused to join in the exercise of the option, husband gave trustees notice that he intended to exercise it and tendered his

check in the amount of $31,020.44, representing the full amount of the balance due. On the following day, trustees, through their attorney, refused to accept husband's exercise of the option on the ground that he alone did not have power to do this, and returned his check to husband. Husband then filed the pending petition.

Since their separation, husband and wife have been continuously engaged in a series of lawsuits in the Montgomery County courts involving: (1) a contested divorce action; (2) various suits by wife against husband for support of herself and her children; and (3) litigation to determine ownership of a racing boat, a "Cal 40," which is 40 feet long, sleeps eight people, has a good racing record, is well known, is named "Windborne," and is titled in the joint names of husband and wife (it appears from the evidence that this boat was bought with the proceeds of the sale of their first boat which husband built over a period of three years and sold for a net price of $19,000, plus a loan made from bank by husband, secured by collateral based upon an inheritance received by husband from a member of his family); and, finally, the present case concerning the exercise of the option, which has produced a record of over 300 pages. Meanwhile, the homestead at Beech Hill Road has increased in value from the $52,500 purchase price to the current appraised value of $78,000.

Petitioner takes the position that the option is worth approximately $50,000, viz., the $22,410.27 already paid by the marriage entity, towards the purchase of the property, and the increased value of the property; and that since wife did not join in the exercise of the option, he had the right to do so alone. Wife and trustees take the position that the option could not be exercised without the joinder of wife and since she refused to join husband in exercising the option and the dead-

line of October 30, 1969, has passed, the option has ceased to exist.

The above-recited extended litigation between husband and wife and their conduct throughout the current case evidences the bitterness and hatred which has developed between them. It was particularly noticeable when husband and wife, respectively, were on the witness stand. Both seemed to gloat in publicly demonstrating their hostility to each other and in revealing the other's sins. The court urged them to refrain from this, but noted of record that if they "wanted to wash dirty linen in court, then that is the prerogative of litigants." They fully exercised this prerogative.

Husband and wife were so self-centeredly interested in venting their spleen against each other and obtaining court victory that they have almost completely ignored the welfare of their children. Each has testified to, or implied, acts of infidelity upon the part of the other. Moreover, wife testified that husband forced her into a "blackmail agreement" with respect to the filing of income tax returns at the time of the separation. Finally, in refusing to join in the exercise of the option, wife is selfishly attempting to obtain for herself the advantage of all moneys spent upon the house by the marriage entity and all of the profit arising during the past 10 years from the increased value of this house.

It would appear that husband undertook most of the negotiations with trustees in this transaction. This was normal for a husband to do, especially since he was a lawyer. Wife's counsel urges that husband's conduct was improper, fraudulent and even unethical, and that he should have advised and urged wife to employ independent counsel to advise her. This argument is absurd. Husband and wife were happily married. The law would truly be amiss if it required

every happily married, trustful wife to employ independent counsel whenever the married pair bought a house, or an automobile, or a boat, or securities, or decided to enter into any financial transaction, major or minor. No more conducive cause for disharmony and possible divorce could be devised than this. Moreover, wife testified that before the purchase of the Beech Hill Road house she had consulted a Norristown lawyer, named Hastings, and later the able lawyer and former Pennsylvania Bar Association President, Desmond J. McTighe, Esq., with respect to her domestic difficulties. Wife was a cultured, educated woman, married to a lawyer, and experienced in obtaining advice of counsel when she felt the need; rightly, she had no fears about the purchase of the Beech Hill property, because the agreements were eminently fair. Nichols v. Nichols, 149 Pa. 172 (1892), and Shapiro v. Shapiro, 424 Pa. 120 (1966), relied upon by wife's counsel, are not at all applicable because in the instant case, husband did not deal with wife's property; he and wife jointly agreed to purchase the house at Beech Hill Road and to use part of the trust corpus as the vehicle to make that possible. However, Mr. Justice Cohen's dissent in Shapiro is most apt, and his advice appearing on pages 139 and 140, could well be heeded by the parties here, namely: [This is not printed here as the cogent portion of the opinion appears in the opinion of the court en banc, post.]

True, it would be to wife's present advantage to prevent husband from exercising the option jointly or individually. But husband and wife, as members of the marriage entity, provided the $22,410.27 difference between the proceeds received from the sale of the Fairview Road property and the purchase price of the Beech Hill Road property. Furthermore, the latter property increased $26,000 in value during the 10

years that the lease-purchase agreement was in existence and the Bedfords occupied it as their own home. Moreover, they made substantial improvement and repairs to it, costing in the neighborhood of $5,000, fully expecting, until their marital discord developed, that ultimately they would own this, their home, as tenants by the entireties. As husband testified, "Well from the outset it was understood that this option would be exercised. There was never a doubt between us. Right from the time that we got it up it was understood that this lease option was a device . . . to buy this property. Of course, we treated it as our own." To allow wife to reap the sole benefit from the payments of $22,410.27 made by the marriage entity and the increased valuation of the property fits wife's counsel's apt, but misapplied, statement in his brief: "A more outrageously inequitable result could hardly be imagined." Equity dictates that these amounts should be equally shared by husband and wife, along with the other assets acquired by them during the tenure of this marriage union.

There is no doubt that during a considerable period of this marriage the income of wife from her family, her trust funds, her mother's estate and support supplied by her grandfather during his lifetime and later from the trust he created for her was much larger than that of husband, at least in the early years of this marriage, because, with the express approval of both parties, husband attended college and law school and later embarked upon the tedious, slow and difficult task of building a law practice. However, one matter is crystal clear, viz., the obligations to trustees were punctiliously met and the $12,500, plus settlement costs were repaid to trustees by the Bedfords, irrespective of who paid what portion thereof.

The record indicates that the Bedfords lived well,

even luxuriously, for comparatively young married people; that wife had a substantial independent income and that, like many married couples (rich or poor), they spent most of their combined incomes for necessaries and luxuries. It also appears that certain expenses were usually paid by one spouse, some by the other, and although wife now has a feeling of unfairness at the extent of her own contribution, it is patent that husband also devoted the major part of his income to the support of his family. The Bedfords' standard of living could not have been maintained without their joint contributions. Moreover, there is no evidence that, at the times involved, wife was not satisfied to add her income to husband's to make this possible. Moreover, it is to be noted that wife testified that during their marriage she never balanced the checkbook or added up the various expenses. She merely drew checks to pay for bills or items as needs arose.

None of this, however, is really germane to the issue. In a happy, successful marriage each spouse makes contributions. How can a court, or anyone else, evaluate the late hours spent by a husband in an effort to succeed in his profession, viz., after working during a regular business day, as house counsel to a corporation and then spending three nights a week in a home law office? How does one evaluate the time and effort expended by a wife in running a house, cooking, cleaning, carrying a child during pregnancy, and in caring for children during their babyhood and later when of school age? In a happy marriage, each partner contributes his or her share.

The court is satisfied that both husband and wife contributed the major portion of their respective incomes from various sources to the needs of the family and the operation of the household. Therefore,

all payments made to trustees towards the purchase price of the Beech Hill Road house were contributions from the marriage entity and constituted equal contributions by husband and wife, irrespective of the amounts in dollars paid by each. Moreover, where there is any uncertainty on this subject, there is an inference that each party paid half. See Zahorsky v. Leschinsky, 394 Pa. 368. Hence, husband and wife are each entitled to an equal undivided interest in the house, at its increased value. It follows from the above that husband and wife were jointly entitled to exercise the option to purchase the house prior to the expiration of the option date and if she refused, the husband had the legal right to exercise the option alone. It is to be noted that the exercise of the option will not cause any loss to the trust corpus, because the full book value of the Beech Hill Road house investment, viz., $52,500, will be replaced by cash in the trust corpus.

There is little Pennsylvania law on the subject of exercise of a joint option. There appears to be only one Supreme Court decision directly in point, namely, Schaeffer v. Herman, 237 Pa. 86 (1912). In that case an option had been obtained in the joint names of Schaeffer and Sheffer. Thereafter, differences arose between them and Sheffer refused to join in the exercise of the option; furthermore, he obtained another option for himself and others. The court held that Sheffer's refusal to join in the exercise of the option did not destroy Schaeffer's rights; and that Schaeffer had the right to exercise the option, alone, stating, at page 92, et seq.:

"The learned court below found as a fact that Sheffer in taking the new option, and Herman [the vendor] in giving it, acted in bad faith and in wilful disregard of the rights of Schaeffer under the original agreement. Under this state of facts, it is perfectly clear, that the

rights of Schaeffer under the original agreement should be protected, provided he was in position to assert them without the co-operation of Sheffer. It is contended for appellants that when a contract for the purchase of real estate recites that the conveyance shall be made to two persons, a bill cannot be maintained by one to compel the vendor to convey the entire title to that one . . . *Even if Schaeffer be considered nothing more than a joint purchaser with Sheffer, he had the right to pay, or tender payment of, the entire purchase price, and when he did so, the most Sheffer could insist upon was that as to his share, Schaeffer held an equitable title, which could not be asserted without Sheffer either paid, or tendered, his share of the purchase money, and this he failed to do. There is a fiduciary relation existing between joint tenants, joint vendees and joint optionees, which gives to one the right to perform acts beneficial to the common estate. Surely, Schaeffer, one of the optionees, had the right to pay, or tender payment of, the entire purchase price, and when he did so, as the court below found he did, the optionors were not in position to say we will not comply with our covenant to convey because both of the optionees did not join in making the tender. Either one of the optionees could tender the entire purchase price and thus exercise the option* . . . We therefore conclude, under the facts as found, that Schaeffer was in position to compel specific performance of the contract." (Italics supplied.)

Like Schaeffer in the cited case, husband in the instant case elected to exercise the option and tendered the agreed price. Moreover, like Sheffer, wife, acting in bad faith in an effort to destroy the option, refused to join in the exercise thereof. This placed trustees in a difficult position. Their refusal to accept husband's exercise of the option and his accompanying check

constituted proper trustee action and fulfilled their duty to protect the trust. This left final determination of the issue for the court. . . .

[Here the opinion cites and quotes from Bolich v. Lynn, 47 Pa. County Court Reports 578, 581 (C. P. Northampton, 1919); Madden v. Gosztonyi Savings & Trust Co., 331 Pa. 476 (1938); Stevens Estate, 15 D. & C. 2d 199 (1958); Magee v. Morton B. & L. Assn., 103 Pa. Superior Ct. 331, 337 (1931); Williams v. Barbaretta, 359 Pa. 488 (1948); Schweitzer v. Evans, 360 Pa. 552 (1949); Stemniski v. Stemniski, 403 Pa. 38 (1961); Berhalter v. Berhalter, 315 Pa. 225 (1934); Reifschneider v. Reifschneider, 413 Pa. 342 (1964); Nachman v. Nachman, 417 Pa. 389 (1965); and Lindenfelser v. Lindenfelser, 383 Pa. 424 (1956).]

Applying the principles of law established in the cited cases, husband in the instant case had the right and power to exercise the option on behalf of the tenancy by the entireties. Moreover, wife did not have the power to defeat husband's exercise of the option. Wife's refusal to join husband in exercising the option was an attempt to destroy the option and to deprive the entireties estate of a valuable asset, namely an equity in the Beech Hill Road property worth about $50,000. Wife specifically testified that her action was motivated by her desire to keep the property permanently in the trust, of which she was the income beneficiary and in which husband had no interest.

The ad litem vigorously argued that husband did not have the right to exercise the option without the joinder of wife. She urged that it would be contrary to testator's intention and to the detriment of both wife and the remaindermen of the trust, whom she represented, for the court to permit this. However, portions of her brief bear on the issues before the court, . . . [brief quoted at length].

Wife has testified with bitterness and hostility that the idea of purchasing the Beech Hill Road house was solely the husband's and not hers; that she did not wish to leave the Fairview Road house; that, at most, she was reluctant to do so; that she and husband were having marital difficulties at the time and she had, therefore, consulted counsel in re possible divorce action. The ad litem's report at that time, her present brief, and her testimony at the hearing on the instant petition are diametrically opposed to this . . .

Where their testimony differs, the court believes the ad litem and disbelieves Mrs. Bedford.

In short, this lease-purchase agreement was the joint action of a happily-married couple with three young children, who were eager to acquire, and ultimately own, a more spacious, luxurious home, better adapted to their needs. Both husband and wife were in complete agreement with the terms of the agreement. They jointly shared the dream of owning this beautiful new home. Wife completely approved the arrangements imaginatively devised by her lawyer-husband. She is intelligent, educated and experienced. She knew what she was doing. Neither husband nor wife anticipated the sad turn their marriage would take. Hence, the valuable equity in the property was an asset of the entireties' estate.

## FINDINGS OF FACT

The court makes the following findings of fact:

1. In 1959, both husband and wife wished to acquire the property at 256 Beech Hill Road, Wynnewood, Pa., as a home, and to own title thereto, as tenants by the entireties, within 10 years of acquiring it, and to use a portion of the corpus of this trust as a vehicle to make this agreement possible.

2. Both husband and wife understood and approved

the plan devised to accomplish the acquisition of the aforesaid home.

3. At the time the lease-purchase agreement was executed, both husband and wife fully intended to exercise the option to purchase the Beech Hill Road property before the option expired on October 30, 1969.

4. Husband and wife were happily married in October 1959, and neither contemplated separation or divorce; hence, this was not provided for in the agreement. However, the possibility of wife's death was considered, and provision was made therefor.

5. Exercise of the option does not cause any loss of corpus to the trust, but, in fact, replaces real estate with cash in the amount of the investment, viz., $52,500.

6. Husband and wife contributed the major portion of their respective incomes to the purchase of the Beech Hill Road house and the operation of the household, including payment for food, clothing, automobiles, schooling, taxes, etc., although wife's contribution was greater in the early years of their marriage owing to the fact that, by mutual consent, husband was attending college and law school.

7. There is no credible evidence that prior to the separation of the Bedfords in October 1968, either party had amassed a separate estate, and if any separate estate was acquired by either of them, what the amount or value thereof was.

8. Husband, in good faith, prior to the expiration date of the option, offered to exercise the option and tendered his check to trustees in the amount of $31,020.44, the full amount necessary for the purpose.

9. Wife, in bad faith, refused to join husband in the exercise of the option, with the intent to deprive husband of any interest in the amounts paid by the marriage entity toward the purchase of the house, its

improvement and repair, and the increase in its value, and thereby to acquire the use of the house for herself as life tenant of the trust, to the exclusion of husband and to use this as leverage in her litigation against him in the divorce action, the support claim and the suit over the ownership of the boat.

10. The option to buy the house is an asset of the marriage entity.

## CONCLUSIONS OF LAW

The court reaches the following conclusions of law:

1. Husband and wife fully understood the lease-purchase agreement when they executed it and they are bound by its terms.

2. Wife cannot deprive husband of his interest in this valuable option by refusing to join in the exercise thereof.

3. Wife acted in bad faith in refusing to join in the exercise of the option.

4. Husband had the right and power to exercise the option, alone.

5. Husband properly exercised the option when he tendered his check to trustees in the requisite amount of $31,020.44 on October 1, 1969.

6. Trustees should have accepted the check and executed a deed to husband and wife as tenants by entireties on October 1, 1969; however, their refusal to do this was done in good faith and on proper advice of counsel.

7. The filing of this petition constituted lis pendens, preserved the option and prevented the option from expiring on October 30, 1969.

8. Husband and wife are now entitled to exercise the option.

9. Fees herein or hereafter awarded to counsel for trustees for services rendered in the instant case and

compensation to the ad litem herein or hereafter allowed are to be charged to the corpus of the trust, but the trust is to be reimbursed therefor by adding such fees and compensation together with costs of settlement to the purchase price of the property.

10. If wife joins husband in exercising the option, each shall pay one half of the balance of the purchase price of the property, including fees to trustees' counsel, compensation to the ad litem and settlement costs; if, however, wife refuses to join husband in exercising the option and husband elects to exercise the option alone, husband shall pay the balance of the purchase price of the property, including fees to trustees' counsel, compensation to the ad litem and settlement costs . . .

*Norman H. Brown,* for petitioner.

*Lawrence A. Brown,* for respondent.

*J. Victor O'Brien,* of *Fox, Rothschild, O'Brien & Frankel,* for truetees.

*Judith J. Jamison,* guardian and trustee ad litem.

### OPINION SUR EXCEPTIONS

SAYLOR, J., December 17, 1971.—No useful purpose would be served by attempting to rehash the sordid details of the acrimonious and disgusting warfare which this couple, who have been divorced since this litigation began, have been waging. They are both so full of hate and desire for vengeance that they have completely forgotten their responsibilities and obligations to their three children, aged 21, 19 and 15, who are the innocent victims of this disgraceful litigation.

Judge Lefever, in a carefully thought out opinion, has fully described the factual background of this case and has ably reviewed the applicable decisions. Although there may appear to be some merit to the arguments advanced by these two fierce warriors, basically they are both wrong. We are in full agreement with

Judge Lefever's findings of fact, conclusions of law and decree except that a majority of the court, with Judge Lefever's approval, have come to the conclusion that the decree should be modified as hereinafter set forth.

We approach the difficult problem with which we are confronted by keeping before us three basic principles of law affecting such situations.

1. *Specific performance in equity is a matter of grace and not of right.*

In Hoffman's Appeal, 319 Pa. 1, 5 (1935), Mr. Chief Justice Maxey stated:

". . . In Burk's App., 75 Pa. 141, this court said: 'The specific performance of a contract in equity is of grace, not of right.' See also Edelstein v. Sell et al., 269 Pa. 288, 112 A. 435, and Willard v. Taylor, 8 Wall. 557. '. . . Specific performance of a contract will not be decreed where its enforcement would be inequitable under the particular facts as they exist. This is in accordance with the general doctrine of equity that when a party comes into a court of chancery seeking equity he must have clean hands, and is bound to do justice, and not ask the court to become the instrument of iniquity. Before relief will be granted it must appear that good conscience and substantial justice require it': 25 R. C. L., page 223, section 21; King v. Hamilton, 4 Pet. 311."

2. *The orphans' court has the right and the duty to dispose of every facet of a case before it.*

We repeat what we said in Fisher Estate, 26 D. & C. 2d 351, 357 and 358, (1962):

"The jurisdiction of the orphans' court is entirely statutory in origin: Rogan Estate, 394 Pa. 137, 140 (1958); Smith's Estate, 141 Pa. Superior Ct. 571, 575 (1940). It is a court of limited jurisdiction, exercising only such power as is given by statute, expressly or

by necessary implication: Watson's Estate, 314 Pa. 179 (1934); Cutler's Estate, 225 Pa. 167 (1909). Within its appointed orbit its jurisdiction is exclusive, and therefore necessarily as extensive as the demands of justice: Shollenberger's Appeal, 21 Pa. 337, 341 (1853). Its process is plastic, and its power is limited only by the necessities of the case, and by its duty to administer equity in accordance with established rules. It needs no other court to finish its work: Odd Fellows S. Bank's Appeal, 123 Pa. 356, 365 (1888). See Heinz's Estate, 313 Pa. 6 (1933). When its equitable jurisdiction is invoked, it is sufficient to embrace every relief necessary for a full disposition of the case, because equity abhors multiplicity of suits: Winton's Appeal, 97 Pa. 385, 395 (1881). See also Mellinger's Estate, 334 Pa. 180 (1939).

"The legislature in section 304 of the Orphans' Court Act of August 10, 1951, P. L. 1163, reenacted this basic principle in the following language:

'The Orphans' Court shall have all legal and equitable powers required for or incidental to the exercise of its jurisdiction.' "

3. *A court of equity is not bound by strict common-law rules.*

In Ruggieri v. W. Forum Corp., et al., 444 Pa. 175, 180, decided October 12, 1971, Mr. Justice O'Brien, speaking for the court, stated at pages 180-181:

". . . Equity courts are not bound by strict common-law rules, and they possess broad powers to do substantial justice, and will depart from the rigid rule of law wherever it is necessary to accomplish the ends of justice. Weissman v. Weissman, 384 Pa. 480, 121 A.2d 100 (1956) . . ."

See also Shewchuk Estate, 444 Pa. 249, 262 (1971).

There is no doubt that Mrs. Bedford is one of the primary objects of the bounty of Edwin H. Dunwoody, testator in this case, and that he intended the trust

he created to supply her and her family with a home. However, it seems clear that testator never intended her and only one or more of her grown children, to live in a $78,000 house, complete with a law office and the usual accouterments, instead of the residence located at 132 Fairview Road, Penn Valley, Lower Merion Township, Montgomery County, Pa., in which Mr. and Mrs. Bedford and their growing family lived at the time of testator's death and which was sold for $29,280 pursuant to the decree of this court. Moreover, testator did not invest $29,280 in the Fairview Road property, because most of the construction of it was done by Mr. Bedford, who was an experienced carpenter and builder. All that testator provided was the land and materials. Furthermore, both Mr. and Mrs. Bedford contributed substantial labor in making improvements to the Beech Hill Road House.

In applying equitable doctrines to this case, we cannot overlook the fact that in one of the lawsuits between these hostile parties in the Montgomery County Common Pleas Court, Mrs. Bedford challenged Mr. Bedford's ownership and right of possession in the racing sailboat "Windborne" which was titled "in joint names" but which was purchased for $31,000 by Mr. Bedford with the $19,000 net proceeds he received from the sale of his first boat which he, himself, built on weekends and holidays over a period of three years, together with other moneys which he was able to borrow. We have been informed by counsel that this litigation has terminated in the sale of "Windborne" by a court-appointed trustee and that the net proceeds, which will be considerably less than the cost thereof, is in the process of being distributed equally between the parties.

We believe that the following excerpt from Judge Lefever's quotation from the dissenting opinion of the

late Mr. Justice Cohen in Shapiro v. Shapiro, 424 Pa. 120, 139 (1966), is particularly pertinent to the present situation:

"The history of the marital relationship which is recounted in appellant's brief clearly demonstrates to me that this is not the type of litigation that can be determined by reference to specific interests in specific property.

". . . The business relationship of this husband and wife is not unlike the relationship that exists in most marriages. Only when that marital relationship sours do unrealistic principles involving the business relationship demand application. I would not apply those unrealistic principles to the facts of this case. I would vacate all previous determinations made in this and in all other extensive and costly litigation indulged in between this husband and wife, and require of both litigants and counsel that all actions at law be terminated and a settlement of their differences consummated . . ."

We are of the opinion that this court must act firmly and decisively in order that the Gordian knot in this sad case can best be cut by compelling the parties either to agree upon a private sale of the house at 256 Beech Hill Road, Wynnewood, or, failing such an agreement, that the house be sold at public auction.

Accordingly, we dismiss the exceptions of Mrs. Bedford and enter the following:

### AMENDED DECREE

And now, to wit, December 17, 1971, it is hereby ordered and decreed that:

1. Virginia K. Bedford shall have the right within 30 days from the date hereof to agree in writing to join Frank A. Bedford, 3rd, in exercising the option to purchase the property at 256 Beech Hill Road, Wynnewood, Pa., from trustees for the total sum of $31,020.-

44,[1] plus trustee's counsel's fee and the ad litem's compensation, as hereinafter provided, and settlement costs, in which event she shall deliver to trustees, in person or by registered mail, her written agreement to exercise the option and shall also in person or by registered mail serve copies thereof upon J. Victor O'Brien, Esq., the trustee's counsel, Frank A. Bedford, 3rd, and his counsel, Norman H. Brown, Esq.;

2. If Virginia K. Bedford fails within 30 days from the date hereof to signify in writing her agreement to join Frank A. Bedford, 3rd, in the exercise of the option in the manner hereinabove set forth, Virginia K. Bedford and Frank A. Bedford, 3rd, hereby are authorized and empowered to agree in writing within 90 days thereafter as to a method for the private sale of the said property at 256 Beech Hill Road, Wynnewood, Pa.;

3. In the event that the property at 256 Beech Hill Road, Wynnewood, Pa., is not sold at private sale pursuant to agreement between Virginia K. Bedford and Frank A. Bedford, 3rd, as provided in paragraph 2 herein, within the time specified, the trustees are hereby directed and empowered to sell the property at 256 Beech Hill Road, Wynnewood, Pa., at public auction;

4. The trustees are hereby authorized and directed to convey title to the property at 256 Beech Hill Road, Wynnewood, as provided in paragraphs 1, 2 and 3 of this amended decree if, as and when the sale is consummated;

[1] In a letter, dated October 1, 1969, to the trustees (plaintiff's exhibit 9-A), Mr. Bedford computed the purchase price of the house at $53,439.91, viz., $52,500, the actual price, plus his portion of the settlement costs of $939.91. He deducted therefrom the Bedfords' initial payment of $10,719.47, plus $11,700 paid on account, (including $1,200 held in escrow at Provident National Bank) or a total of $22,419.47. This left a balance remaining due of $31,020.44, the amount which he tendered to trustees.

5. The trustees are hereby directed and empowered to distribute the net proceeds of the sale of 256 Beech Hill Road, Wynnewood (after deducting brokerage fees, transfer taxes, advertising costs and all other expenses incident to the sale thereof) as follows:

(a) counsel fee to J. Victor O'Brien, Esq., of Fox, Rothschild, O'Brien & Frankel, attorney for the trustees, in the amount of $2,500, the amount originally requested by him;

(b) compensation in the amount of $1,800, to Judith J. Jamison, Esq., the amount originally requested by her for services rendered as guardian and trustee ad litem;

(c) $31,020.44, plus the fund held in escrow at Provident National Bank (see footnote 1), to the corpus of the trust;

(d) the balance in equal shares to Virginia K. Bedford and Frank A. Bedford, 3rd;

6. If Virginia K. Bedford requests the trustees to purchase a home for her and her family, the trustees are hereby directed and empowered to purchase such a home, in an amount not to exceed $35,000, trust corpus to be used for such purpose and the said home to become an asset of the trust corpus.

CONCURRING AND DISSENTING OPINION

SHOYER, J., December 17, 1971.

The heart of this litigation remains the testamentary trust established by the wife's maternal grandfather for her and her issue. The hearing judge unquestionably recognized this when he expended so many hours listening to the testimony of the lessees as they recounted their marital complaints, discords and hostilities. Absent the chancellor's full recognition of this basic fact, the ex-husband's petition for permission to

exercise his alleged rights under the lease option of 1959 could have been granted or denied with little or no ado. In my opinion, the objections by the guardian-trustee ad litem have obvious merit.

It was as a member of the life tenant's "family" that the trustees extended to husband (and wife) the privileges of item five of the trust to sell the first home and invest the proceeds and *additional trust funds* in a new residence for the life tenant "and her family." The hearing judge was correct in investigating the situation before he acted on the initial petition to approve the trustees' purchasing the home. His 1959 decree was in the spirit of the trust and fully warranted by the report of the ad litem. Unfortunately, later events proved it to have been improvidently entered in that it did not provide for the future possibility of family discord and divorce, as it did for the premature death of the life tenant. Such a provision, however, I consider to be just as much a part of the lease option between the parties as though it had been expressly inserted in writing. Specific performance is not a matter of right but of grace, and the remedy will not be granted in the face of fraud, accident or mistake.

In the category of mistake fall cases of unforeseen and unexpected hardship and also injury to third persons. A leading case on the first point is Willard v. Tayloe, 8 Wall. (75 U.S.) 557, 19 L. Ed. 501 (1869). There, the United States Supreme Court decided that the lessee could enforce specific performance against the vendor on the exercise of an option made in 1854, to be exercised during the 10-year term of a lease of which it was a part, and exercised just before the expiration of the term in 1864, but only on payment of the purchase price in coin or its equivalent, not in the new legal tender notes issued during the Civil War which were worth only about half the value of gold and silver coin of equal amount, which was the basis of the

currency at the time the option was given. "Such a substitution of notes for coin could not have been in the possible expectation of the parties . . . The complainant must, therefore, take his decree upon payment of the stipulated price in gold and silver coin. Whilst he seeks equity he must do equity."

Here, because he is no longer a member of the family and waited until the last moment to exercise his option, thus gaining credit for 10 years of *rent payments* toward the purchase price, petitioner in my opinion has lost his former right to net any likely profit. Of course, he is entitled to be made whole: Ruggieri v. W. Forum Corp., et al., 444 Pa. 175, 181 (1971).

Over and beyond the question of petitioner's gaining a profit at the expense of the trust and its beneficiaries, the life tenant and her children, is the fact that the majority of this court in paragraphs (1) and (2) of its decree, has authorized a procedure which could prove an actual injury or hardship to some or all of the three children.

Professor Pomeroy in his authoritative treatise on Equity Jurisprudence has this to say about hardship as a defense to a claim for specific performance, Vol. 4, §1405a, p. 1043, 5th ed., 1941:

"The elements which peculiarly affect the *equitable** character of the agreement and of the remedy are the following: *The contract must be perfectly fair**, equal, and just in its terms and in its circumstances. If, then . . . its enforcement would be oppressive or hard on the defendant, or would prevent his enjoyment of his own rights, or would work any injustice . . . then a specific performance will be refused. It necessarily follows that a *less strong case** is sufficient to *defeat* a suit for a specific performance than is requisite to obtain the remedy (see §400). The remedy will therefore be refused when the performance of the

contract would work a breach of trust, *or work injury to third persons.*\*\*

"The contract and the situation of the parties must be such that the remedy of specific performance will not be *harsh or oppressive.*\* This rule generally operates in favor of defendants . . . The oppression or hardship may result from . . . the situation of the parties, unconnected with the terms of the contract or with the circumstances of its negotiation and execution; that is, from external facts or events or circumstances which control or affect the situation of the defendant.[13]" (\*Italics by the author). [\*\*Italics supplied.] [footnotes omitted]

The majority has said that it is time for this venomous litigation to come to a stop. I wholeheartedly agree. To this end, I approve the sale of the property by the trustees either at private sale, or at auction as in paragraph (3) of the decree, and the purchase of a new home as in paragraph (6). My brethren have accurately stated that "testator never intended [his daughter, the life tenant] and only one or more of her grown children to live in a $78,000 house, complete with a law office and the usual accouterments . . .". I believe that a mandatory sale is an admirable solution to the problem facing us, viz., a home too luxurious for a fatherless family.

I also approve the distribution of the proceeds as provided in paragraph (5)(a), (b) and (c) of the majority's decree. As to paragraph 5(d), the ex-husband is entitled to be made whole. This may mean one-half the balance, perhaps a little more or a little less. But whatever is left after that belongs to the trust, not to the life tenant. Our Supreme Court in Heyl Estate, 352 Pa. 407 (1945), was faced with a situation somewhat analogous. The trustee of a spendthrift trust had made a losing investment in a home for one of two life

tenants at her specific request and upon her assign-
ment of her spendthrift income toward its mainten-
ance. The court voided the agreement between the life
tenant and the trustee as contrary to the intent and
purposes of the trust, saying (p. 411):

" ' . . . When a trust of this kind has been created,
the law holds that the donor has an individual right
of property in the execution of the trust; and to deprive
him of it would be a fraud on his generosity. For the
law to appropriate a gift to a person not intended
would be an invasion of the donor's private dominion.' "

I fear that the majority in paragraphs (1), (2) and
(5)(c) of their decree have sacrificed testator's intent
for the benefit of one who is no longer a member of
the "family."

For the reasons above set forth I concur in part and
dissent in part from the decree of the majority.